IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RICKY L. KIDD, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No.: 03-0079-CV-W-SOW |
| ) | |
| DONNA McCONDICHIE, ) | |
| ) | |
| Respondent. ) | |

## ORDER

Before the Court is petitioner's Amended Petition for Writ of Habeas Corpus (Doc. #51). The Court held an evidentiary hearing in this matter on June 22-23, 2009 and July 16, 2009. The parties have submitted post-hearing briefs as well.

### I. Background

George Bryant and Oscar Bridges were murdered on February 6, 1996 at George Bryant's home. George Bryant was shot and killed in the front yard. Police found the body of Oscar Bridges in the basement of the home. Bridges' hands, feet, and mouth had been bound with duct tape and he had been shot in the head with a .45 caliber gun.

Marcus Merrill and petitioner Ricky Kidd were tried and convicted of these murders. The evidence adduced at their trial, and again before this Court, shows that three men were involved in the murders.

Petitioner claims that the murders were committed by Marcus Merrill, Gary Goodspeed, Sr., and Gary Goodspeed, Jr. Petitioner alleges that his trial counsel failed to investigate his case properly and failed to present critical evidence to the jury and that he is actually innocent.

A.     Marcus Merrill

At the evidentiary hearing before this Court, Marcus Merrill testified for the first time that Kidd was not one of the three men who robbed and murdered George Bryant and Oscar Bridges. Merrill now claims that the crimes were committed by him, Gary Goodspeed, Sr., and Gary Goodspeed, Jr. Merrill acknowledged that he did not come forward with this information until after he had exhausted all of his appellate options. Merrill also acknowledged that he is hoping that by coming forward, exonerating Kidd, and offering to testify against the Goodspeeds, he might be able to get some relief from his current sentence of life without the possibility of parole.

It is undisputed that Merrill initiated contact with petitioner Kidd through another inmate. In that first contact Merrill stated that he wanted an avenue to get himself out on appeal. At the hearing before this Court, Merrill made it clear that he was coming forward now in the hope that he could testify against the Goodspeeds in exchange for a reduction in his own sentence.

It has been established that Marcus Merrill, Gary Goodspeed, Sr., and Gary Goodspeed, Jr., flew to Kansas City, Missouri from Georgia the week prior to these murders. Merrill is a cousin of the Goodspeeds. Also, Merrill was employed by Gary Goodspeed, Sr. at a pet grooming business in Georgia at the time of the murders.

Although Merrill now claims that he was with the Goodspeeds at Bryant's home, and committed the murders with them, petitioner Kidd testified before this Court and admitted that he had met with Gary Goodspeed, Sr. the day prior to the murders and that Goodspeed, Sr. wanted Kidd to murder Bryant. Kidd claims that he told Goodspeed, Sr. that he would not murder Bryant. Kidd's testimony before this Court contradicts his trial testimony that he did not meet with the Goodspeeds at any time in 1996 and, specifically, did not meet with them in February of 1996.

Similarly, Kidd's girlfriend, Monica Gray, told police on February 14, 2006 that Kidd had not told her anything about the murders. Gray testified before this Court that she knew Kidd met with the Goodspeeds both before and after the murders.

According to Marcus Merrill, on the morning of the murders, Merrill was at the home of Eugene Williams. Merrill claims that Gary Goodspeed, Sr. paged him and he subsequently met up with the Goodspeeds at Eugene Williams' home. Merrill testified before this Court that Goodspeed, Sr. informed him that he was going to George Bryant's house to buy cocaine and wanted Merrill to go with him. Williams has testified that the three men were planning to rob Bryant. Both Merrill and Eugene Williams have now testified that on the morning of the murders, Goodspeed, Sr. was armed with a .45 caliber pistol, Goodspeed, Jr. had a .38 revolver, and Merrill had a nine millimeter pistol.

Merrill gave the following testimony before this Court about how the murders were committed: when Merrill and the Goodspeeds arrived at George Bryant's home, Bryant raised his garage door and welcomed the three men into the home. Once they were all inside the home, Goodspeed, Sr. pulled out his gun and told Bryant to "give it up." Bryant rushed Goodspeed, Sr., Goodspeed, Sr. fired his gun, and Bryant went down. Bridges was taken down to the basement and shot. Bryant attempted to escape through the garage and Merrill shot Bryant in the back with his nine millimeter pistol. Goodspeed, Sr. then came out and shot Bryant again.

Despite Merrill's claim that he shot Bryant in the back with a nine millimeter pistol, the bullets recovered from the bodies of Bryant and Bridges were all fired from the same .45 caliber gun. A lead fragment found on the floor of the garage came from a second gun of unknown caliber. Two months after the murders, Connie Bryant, George Bryant's wife, found a spent nine millimeter

cartridge in the garage.

Merrill testified before this Court that the murders were committed by him and the Goodspeeds. Merrill testified that petitioner Kidd was not present during the murders and was not involved in the murders. Prior to testifying before this Court, Merrill had never exonerated petitioner Kidd.

B.   Richard Harris

At the jury trial, Richard Harris testified as an eyewitness and identified petitioner Ricky Kidd as the person who shot George Bryant outside Bryant's home. Harris was a neighbor of George Bryant and explained that he was approaching Bryant's home on foot when he saw Bryant run out of the garage. Harris testified that Bryant was followed outside by a man he identified as Kidd who shot Bryant. At the jury trial, Harris testified that he was "2001 percent sure" that petitioner Kidd was the man who shot George Bryant. Kidd claims that Harris is lying and is an unreliable witness.

When he testified before this Court, Harris admitted that he had falsified and edited the information that he gave to the police at the time of the murders. Harris explained that he was concerned that he might be a suspect in the murders and that he wanted to direct the police away from him. It is undisputed, however, that Harris identified Kidd as the shooter in a pre-trial photo line-up. He identified Kidd as the shooter in a deposition in this habeas action. Finally, Harris stood by his identification of petitioner Kidd as the shooter when he testified before this Court.

Specifically, Harris indicated that he was troubled by Marcus Merrill's new claim that petitioner Kidd was not involved in the crimes. Despite Merrill's claim, Harris testified that he still maintains Kidd was the person who shot George Bryant outside Bryant's home. When asked if he would still identify petitioner Kidd as the man who shot George Bryant if he were called to testify

at a new jury trial, Harris said that he probably would still identify Kidd as the shooter.

Kidd argues that Harris is not a reliable witness and relies heavily on certain inconsistencies in Harris' testimony. Specifically, Kidd relies on the fact that during an August 9, 2007 deposition, Harris described the shooter as having long-hair. Kidd's head was shaved completely bald at the time of the murders. Also during the August 2007 deposition, Harris stated that the shooter was wearing a "fawn-colored" jacket. Other eyewitnesses described the three men fleeing from Bryant's house as wearing long black coats, black pants, and black stocking caps.

While Harris may have been inconsistent on a few details, Kidd's argument ignores the fact that the jury who heard his case had substantial reasons to question Harris' reliability as a witness. During the jury trial, Harris was disrespectful to the court, the jury, and the defense attorneys. Kidd's trial counsel asked the jury to disbelieve Harris because his descriptions of the murderers conflicted with the testimony given by other witnesses. Kidd's trial counsel questioned whether Harris could have seen Bryant being shot because another eyewitness did not see Harris near the scene of the crime. Kidd's trial counsel asked the jury not to believe Harris because he did not report the murder to the police and because he only subsequently talked to the police out of his own self-interest. The jury also knew that Harris had a criminal history. Yet, despite all of these issues, the jury chose to believe Harris' identification of petitioner Kidd as the shooter.

The discrepancies identified by Kidd in the August 2007 deposition are similar to those argued by Kidd's trial counsel during the jury trial.

C.    Kidd's Alibi Defense

Petitioner Kidd told the police that he was with his girlfriend, Monica Gray, all day on February 6, 1996. Ms. Gray also told police that petitioner Kidd was with her throughout the day

-5-

Case 4:03-cv-00079-SOW    Document 128    Filed 12/08/09    Page 5 of 11

of February 6, 1996.

Petitioner Kidd testified at his jury trial and told the jury about his alibi for the day of the murders. Monica Gray also testified at the trial as did his sister Nechelle and Nechelle's co-worker, Alana Wesley. A sheriff's deputy and Kelly McGill, Kidd's ex-girlfriend, were also called at the trial to support Kidd's alibi defense.

According to the testimony before this Court from petitioner Kidd, his sister, Nikki Kidd, and Monica Gray, Nikki Kidd stayed with them on the night of February 5, 1996. On the morning of February 6, Nikki Kidd drove petitioner's Toyota to her place of employment. Later, petitioner Kidd drove his 1981 Delta 88 to Nikki Kidd's place of employment to retrieve his Toyota. Petitioner Kidd and Ms. Gray dropped the Delta 88 at their apartment and took the Toyota to a McDonald's restaurant and then went to Lake Jacomo to apply for a gun permit at the Sheriff's Department. After applying for the gun permit, Kidd and Gray went to Kelly McGill's residence. This is the same evidence that was presented at Kidd's trial and rejected by the jury.

Petitioner Kidd faults his trial counsel for failing to obtain the video footage from the security surveillance cameras at Nikki Kidd's place of employment. In addition, Kidd claims that certain testimony could have established that he applied for a gun permit on the afternoon of February 6, 1996.

D.  <u>Ineffective Assistance of Counsel</u>

Petitioner Kidd claims that he received ineffective assistance of counsel at trial. Kidd had an opportunity to raise claims against his public defender in the state court proceedings.

Mr. Kidd's current counsel argues that on direct appeal, Mr. Kidd's public defender challenged the hearsay testimony of detectives about Kayla Bryant's video line-up identification, but

-6-

Case 4:03-cv-00079-SOW   Document 128   Filed 12/08/09   Page 6 of 11

failed to argue that the identification itself was unreliable. His appellate counsel also challenged the failure to sever petitioner Kidd's and Marcus Merrill's trial and argued that Kidd was improperly charged as a prior offender.

## II. Standard

The United States Supreme Court has held that in order to show a "manifest injustice," a habeas petitioner must show that "a constitutional violation has resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995)(*quoting* Murray v. Carrier, 477 U.S. 478, 496 (1986)). Based upon the procedural defaults that have occurred in this case, petitioner Kidd must show that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 537 (2006)(*quoting* Schlup, 513 U.S. at 327).

A petitioner must present "new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." Schlup, 513 U.S. at 324.

## III. Discussion

A.  Marcus Merrill

The Court does not find Marcus Merrill to be a credible witness. There is overwhelming evidence that Merrill was one of the three men who robbed and murdered George Bryant and Oscar Bridges. Therefore, Merrill has known the identities of the other two men involved in the crimes for over thirteen years. Yet, Merrill did not come forward to exonerate petitioner Kidd until he had exhausted every appeal and knew he would be spending the rest of his life in prison.

-7-

Both in his correspondence with Kidd and in his testimony before this Court, Merrill made it clear that he hoped by coming forward and stating that the Goodspeeds were the other two men involved in the crime, he would be given the opportunity to testify against the Goodspeeds in exchange for a reduction in his own sentence.

This Court must consider "how the timing of the submission and the likely credibility of the affiants bear on the probably reliability of that evidence." House v. Bell, 547 U.S. at 537 (*quoting* Schlup, 513 U.S. at 331-32). The timing of Merrill's claim that petitioner Kidd was not involved in the murders causes the Court to question Merrill's credibility. Merrill's blatant attempts to use his recent identification of the Goodspeeds as participants in the murders as a bargaining chip to reduce his own sentence further undercuts his credibility as a witness.

This Court must consider what a reasonable jury would do with Merrill's testimony. *See* House, 547 U.S. at 538. For the same reasons this Court finds Merrill to be lacking in credibility, a reasonable, properly instructed jury would find Merrill to be lacking in credibility.

B.      Richard Harris

There is no doubt that Richard Harris has given some inconsistent statements in this case between February of 1996 and continuing through the hearing before this Court. Despite those inconsistencies, Harris' identification of petitioner Kidd as one of the men involved in the murders has not wavered.

This Court has undertaken a review of Richard Harris' trial testimony as compared to his testimony before this Court. Harris has consistently maintained that he went to Michael Holland's house on the morning of the murders and was returning to his own home along the east side of the street, a route that would have taken him directly in front of George Bryant's house. Harris has

explained that as he approached Bryant's house, the garage door was going up and he heard Bryant "holler" for help. Harris has testified that one man grabbed Bryant and then a second man came out of the house and shot Bryant. Harris described these men as number one and number two. Harris identified number two, the shooter, as Ricky Kidd. Harris has never recanted on this identification.

At the hearing before this Court, Harris stated that while Mr. Kidd's current counsel had shown him Marcus Merrill's testimony, he would still identify Ricky Kidd as the shooter if a new trial were held.

C.  Kidd's Alibi Defense

The jury heard Kidd's alibi defense and rejected it. Kidd has not identified any new evidence supporting his alibi defense that was not available at the time of his jury trial.

D.  Ineffective Assistance of Counsel

Kidd has faulted his trial counsel for not obtaining certain items and for not presenting his case properly to the jury at trial. Specifically, Kidd claims that his trial counsel should have obtained the video footage captured by security surveillance cameras at his sister's place of employment. Kidd believes that such video footage would show that he was at his sister's place of employment at the time of the murders. Kidd has failed to demonstrate that such videotape footage actually existed in 1996 and could have been obtained by his trial counsel. No one from Kidd's sister's place of employment has been called as a witness to explain what types of video surveillance existed at the business in 1996, what areas of the business premises were under surveillance, and the likelihood that Kidd would have been captured on video if he visited the business premises on February 6, 1996.

Similarly, Kidd claims that his counsel should have made a stronger argument that he applied for a gun permit on the afternoon of February 6, 1996. There are two flaws with this argument. The first is that is has still not been definitively established that Kidd applied for the gun permit on February 6. Kidd has adduced evidence that applications were rarely submitted by mail and were generally processed either the day they were received or the following day. While the processing of his application included a background check that was run at 1:47 p.m. on February 6, this does not give Kidd an air-tight alibi. The sheriff's department does not mark when an application is received. The possibility exists that the application was delivered on February 5.

The second flaw in this theory is that even if Kidd's application was submitted on February 6, as he and his current counsel claim, Kidd could have submitted the application prior to or after committing the murders on February 6. The murders were committed around 11:30 a.m. and Kidd would have had time to drive out and submit the application prior to or after committing the murders.

As for the presentation of the case at trial, Kidd claims that his counsel did not properly cross-examine Kayla Bryant and Richard Harris. Kidd's trial counsel may have opted not to cross-examine Kayla Bryant about her identification of Kidd because she did not identify Kidd in court and because she was able to challenge the detectives with regard to Kayla's identification of Kidd in a video line-up. Kidd's trial counsel did point out to the jury that Harris' description of the murderers differed from that of other witnesses, that Harris could not have seen the crime, and that Harris failed to report the murders to the police and ultimately talked to the police only out of his own self-interest.

The difficulty for petitioner Kidd and his current counsel is that at this stage of the proceedings, Kidd must identify new reliable evidence that was not available at the time of his trial

-10-

and that shows he is actually innocent of the crimes. It is not enough for Kidd to blame his trial counsel or to question the credibility of Richard Harris or to challenge the reliability of Kayla Bryant's identification.

The only evidence that Kidd has presented to this Court that was not available to him at the time of his trial is the testimony of Marcus Merrill, claiming that Merrill committed the murders with the Goodspeeds. As discussed above, the Court does not find Merrill to be a reliable witness. Merrill appears to be testifying solely in the hope of convincing someone to reduce his own sentence.

A police detective testified during the jury trial that police received a tip that the murders were committed by Goodspeed, Jr., Merrill, and Kidd. Kidd has not eliminated this possibility with any of the testimony and evidence that he has presented to this Court. While Kidd has raised some serious concerns about how his trial counsel handled the case, Kidd has not convinced this Court that he is actually innocent of the crimes.

## IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that petitioner's Amended Petition for Writ of Habeas Corpus (Doc. #51) is denied.

       /s/ Scott O. Wright
       SCOTT O. WRIGHT
       Senior United States District Judge

DATED: December 8, 2009